Milton Alpert, J.
On September 16, 1965, in the Town of Manasquan, New Jersey, Kathleen Mary Timmins, an infant of the tender age of 3, lost her life as the result of nonaccidental actions of her father, James Timmins, who was then on a home visit pass from Kings Park State Hospital where he was a patient.
*627 Mary Sarah Timmins, the wife of James Timmins and the mother of Kathleen Mary Timmins, was appointed administratrix, with limited letters, of the goods, chattels and credits of her daughter by the Surrogate of Kings County on November 30, 1965. Thereafter, she filed this claim for pain and suffering and wrongful death of Kathleen Mary Timmins which she claimed resulted from the alleged negligence and medical malpractice by the State of New York, its agents, servants and employees, in its care and treatment of the said James Timmins while a patient at Kings Park State Hospital and for the failure of the State to protect Kathleen Mary Timmins.
The claim was timely filed with the Clerk of the Court of Claims and the Attorney-General on December 23, 1965 and has neither been assigned nor submitted to any other court or tribunal for hearing or determination. The claim seeks a total of $350,590 in damages.
James Timmins was married to claimant in 1961 at the age of 25. Two children were born of this marriage: the deceased, Kathleen, and a son, a year younger than the deceased.
In May of 1964, James Timmins lost his job as a bank guard and did not • obtain other steady employment. He began to drink and became depressed, abusive and quarrelsome. He developed insomnia and became restless. As a result, the marriage deteriorated during the latter part of 1964 and the first part of 1965. James Timmins’ condition became progressively worse in that his depression deepened and he became more withdrawn. His actions became disturbed. On several occasions, while under the influence of alcohol, he attacked his wife.
It was finally decided by his wife, after consultation with his family, that he should be hospitalized and treated for his depression. On April 16, 1965, at the age of 29, James Timmins was admitted to Kings County Hospital Center, a hospital operated by the City of New York, upon his wife’s petition. Upon his admission, claimant gave the hospital the necessary history which included statements that James wanted to commit suicide and to kill his wife. His condition at Kings County Hospital Center was diagnosed as “ psychotic depressive reaction — alcoholism.”
At the Kings County Hospital Center, he came under the treatment and care of the staff physicians. In the furtherance of his treatment and therapy, he was granted home visitation passes, usually in the custody of his wife. Several of the visitations were of two and three days ’ duration. While at this hospital he was away on at least nine occasions — May 7 to 8; May 22; *628 May 28 to 29; May 31; June 5 to 6; June 11 to 13; June 18 to 29; June 25 to 29; July 2 to 5.
His depression and withdrawal continued and on July 15, 1965, James Timmins was transferred to Kings Park State Hospital, an institution operated by the New York State Department of Mental Hygiene. He was admitted here, too, upon the petition of claimant and upon the certificate of two physicians. Here, too, claimant gave the admissions director a detailed history concerning her husband. This, too, referred to his thoughts of suicide and that his wife should not live either. Obtaining this second history was necessary because the city hospital generally did not forward hospital records of patients.
It is noted that in neither of the above-referred-to histories, is there any statement concerning threats to kill his children. However, at the trial the claimant testified that she told doctors at the hospitals that her husband had said that their children did not deserve to live either.
Upon admission to the State hospital, in addition to consideration of the history, the patient was interviewed and observed and a diagnosis of “ psychoneurosis: reactive depression ” was made. Tests of the patient were ordered and treatment commenced. The patient’s progress was noted in his records.
After some time at Kings Park State Hospital, James Timmins began to show some improvement under the treatment and medication being prescribed by the physicians at the hospitals, as evidenced in his hospital record. Home visitations and pass privileges were suggested as part of his therapy. His wife objected to such visits if they were to be to her home, but had no objections if such visits were to be in the custody of members of his family and not in her care.
Thereafter, commencing in August of 1965, the hospital records disclosed home visit authorizations on at least five occasions, two of which were in his wife’s custody and three in the charge of a cousin, or one of his brothers — August 15, 22, 26 and 29 and September 5.
On September 12, 1965, James Timmins was released for a six-day home-visit pass at the request of and in the custody of his brother Austin and to reside with him, at the latter’s home in New Rochelle. This record of authorization states that James Timmins had “ favorably responded to chemotherapy ” and had “ satisfactorily adjusted to the hospital routine.” The doctor advised the brother of the request of the claimant that James Timmins not visit with her at 'her home in Brooklyn; and that that was the reason the pass permitted James Timmins to have a home visit at his brother Austin’s home in New Rochelle. *629 The brother was additionally instructed in regard to the medication to be given James and was advised by the doctor that if the visit did not go well or was not producing a beneficial effect, he should return the patient before the expiration of the visit.
Instead of going to and staying in New Rochelle in accordance with the understanding concerning this home visit, Austin Timmins apparently took James Timmins directly to the Brooklyn home of Edward Timmins, another brother. Edward’s home in Brooklyn, was a few doors away from the claimant’s home. When claimant learned of her husband’s presence in Brooklyn, she did not inform the hospital. She did, however, make arrangements for her two children to visit with their father at their uncle’s home where Edward’s two children also were present.
James Timmins’ children visited him at their uncle’s home during the three days he was at his brother Edward’s home in Brooklyn. The family then agreed that James would visit with his sister who resided in the summer resort town of Manasquan, New Jersey. It was also agreed that his daughter Kathleen would accompany him to New Jersey. On September 15, 1968, James Timmins and his daughter traveled to New Jersey to visit. A phone call from the claimant to her sister-in-law confirmed their safe arrival. No one informed the officials of the State hospital of this modification of the terms of the home visit —'Which were that James Timmins would reside with his brother Austin in New Rochelle. Nor were they informed that James Timmins would be accompanied by his daughter on this visit to New Jersey.
Early the next morning, Kathleen was found dead in her bed, her death being the result of nonaccidental actions of her father.
Claimant alleges in her claim that the State failed to properly diagnose and treat James Timmins in conformance with the standards of the New York medical community. It is further alleged that the State failed to obtain a complete history of her husband’s condition, failed to administer electro-shock therapy, failed to use proper drug therapy and to administer proper psychotherapy. Claimant also alleges that the State failed in its duty to protect those who would reasonably be expected to be affected by the irrational behavior of James Timmins and that in view of his condition, he should not have been permitted home-visit passes.
Claimant herself testified as to the occurrences that led to the two hospitalizations, the home visits, and the tragic result. To support her claim as to medical aspects and standards, claimant called upon two experts.
*630 Dr. Pasquale Barbare, a certified psychiatrist, testified that he was on the staff of Kings Park State Hospital, that he interviewed him on admission, and that he prepared the clinical summary on James Timmins. Although he did not treat James Timmins, he testified that he was quite familiar with James Timmins’ hospital record and that he had observed and was familiar with him.
He discussed the ‘1 intake ’ ’ procedures at the hospital and the methods of obtaining the necessary history. In addition to claimant’s history, interviews were had with other members of James Timmins’ family. The hospital records disclosed, in his opinion, a practice and procedure that is normal and proper and which was the commonly accepted procedure in the medical community.
He also discussed the difference between a diagnosis of psychosis and neurosis and the procedures by which such diagnoses are determined and their effects.
His testimony also alluded to the improvement of James Timmins’ condition as noted in the records by the resident physicians. Home visits were prescribed therapy and the visit of September 12, 1965 was permitted upon the conditions previously set forth in some detail in this decision. Such a home visit, Dr. Barbaro stated, was an exercise of a medical judgment as part of rehabilitative procedure.
Dr. George S. Cattanach, a retired, well-qualified psychiatrist, formerly associated with the New York University Medical Center, was claimant’s other expert. He had neither seen nor treated James Timmins, but had reviewed the hospital records.
He agreed that it is good practice and accepted procedure for the admitting director to obtain a history. However, on the basis of his review of the Kings County Hospital Center records, it was his opinion that James Timmins had a psychosis rather than a neurosis and in this respect, he disagreed with the diagnosis made at the Kings Park State Hospital. It was his opinion that the diagnosis, medical record keeping and procedure's at the Kings County Hospital were in conformance with those of the community. It was his opinion that neither hospital should have permitted home visits by James because of his mental condition.
At this point, it is noted that Dr. Cattanach generally approved of the procedures at the Kings County Hospital and the diagnosis there of psychosis. Yet, the court must note that this hospital, nevertheless, authorized at least nine home visits for James, some of which brought James together with his wife and children. Contrasted with this is the authorization by Kings Park State Hospital for the fatal six-day home visit which was *631 for residence in New Rochelle, and not to Brooklyn or to Manasquan in the company of his daughter.
The determination as to whether a patient should be permitted a home visit is a question of medical judgment by the treating physician, as is the determination of the diagnosis if proper medical procedures are followed. Having arrived at a diagnosis after obtaining a history, observing, treating and testing the patient, and observing improvement in his condition, it was decided by the treating physicians at Kings Park State Hospital that a home visit to his brother Austin’s home in New Rochelle was therapeutically valuable and permissible. It was a medical judgment. Liability on the part of the State does not arise if such judgment was, in fact, erroneous (Weglarz v. State of New York, 31 A D 2d 595). The State is not responsible for an honest error of professional judgment made by qualified and competent doctors employed by it (Rodriguez v. State of New York, 12 A D 2d 710; St. George v. State of New York, 283 App. Div. 245, affd. 308 N. Y. 681).
In the opinion of the court, no erroneous judgment has been proved. The evidence discloses at most a difference of opinion between two qualified experts. No negligence on behalf of the State has been shown.
Home visits and passes were authorized by physicians in both hospitals, and were in accordance with accepted standards of medical practice. The modern concept of handling mental illness is one of treatment, not incarceration. The objective is to return the patient to society, which should be done as soon as, in the judgment of properly qualified doctors and psychiatrists, it is safe for others and helpful to the patient.
There is no suggestion that the doctors at Kings Park State Hospital were incompetent or unqualified.
These doctors authorized a home visit to Austin Timmins’ home in New Rochelle. They did not authorize a home visit to Brooklyn or to Manasquan, New Jersey. They did not authorize a home visit in which James Timmins ’ daughter would accompany him to Manasquan. These modifications in the terms of the home visit were made by various members of the Timmins family and no one informed any official at Kings Park State Hospital that they were being made or sought to obtain approval therefor. In authorizing a home visit to New Rochelle, the doctors who authorized it cannot be expected to have anticipated the modifications which were made and the State cannot be held responsible for what occurred because of such modifications.
Tragic as the occurrence was, there is no legal basis for liability of the State. The claim is, therefore, dismissed.
Let judgment be entered accordingly.